UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEAN P. McGRATH,<br><br>              Plaintiff,<br><br>v.<br><br>MICHAEL BOOTH, and DMB-BT, a Nevada business trust,<br><br>              Defendants. | Civil Action No. 20-cv-11651 |

## COMPLAINT AND JURY DEMAND

Plaintiff Sean P. McGrath ("McGrath") brings this action to recover amounts currently due and owing to him under certain contracts entered into with defendant, Michael Booth ("Booth"). For years, Booth has engaged in schemes defrauding individuals and entities into issuing payments to him purportedly to fund certain business ventures, only to keep the funds for personal use, breach relevant contracts, and fail to repay loans and fees. This conduct served as the basis of Booth's criminal fraud conviction in 2002. *See United States v. Booth*, 309 F.3d 566 (9th Cir. 2002). In 2018, as part of his most recent fraudulent operation, Booth solicited loans from McGrath to fund his apparently legitimate luxury golf car business. McGrath issued two loans to Booth pursuant to written loan agreements. Booth did not repay the loans when they became due in 2018, nor has he in the years since. McGrath thus seeks to recover money damages for the breach of these contracts and for the fraud Booth perpetrated upon him. McGrath also seeks recovery of damages, treble damages, and attorneys' fees for Booth's knowing and willful unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 2. Finally, McGrath seeks recovery of damages against Defendant DMB-BT, a business trust, for unjust enrichment resulting from the retention of McGrath's loan funds.

## PARTIES

1. Plaintiff Sean P. McGrath is an individual who at all relevant times hereto has resided in Weston, Massachusetts.

2. Defendant Michael Booth is an individual who at all relevant times hereto has resided in California.

3. Defendant DMB-BT is a business trust as defined under M.G.L. c. 182, § 1, organized under the laws of Nevada with its principal place of business located in the state of Nevada.

## JURISDICTION

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of costs. McGrath is a resident of Massachusetts. Booth is a resident of California. DMB-BT is a resident of Nevada.

5. Booth consented to the jurisdiction of all courts in the state of Massachusetts in two written contracts that contained forum selection clauses requiring that any related dispute, which this action is, "be heard in the Massachusetts courts."

6. This Court has personal jurisdiction over DMB-BT as it accepted monies paid from the state of Massachusetts by a Massachusetts resident pursuant to written contracts that called for any related dispute to "be heard in the Massachusetts courts."

## VENUE

7. Venue is proper because a substantial part of the events giving rise to these claims occurred in the District of Massachusetts. Additionally, these claims arise from contracts containing mandatory forum selection clauses which state that "[a]ny dispute over this Note shall

be heard in the Massachusetts courts." Accordingly, venue is proper in the United States District Court for the District of Massachusetts.

## FACTS

### Booth Is a Career Criminal Who Has Been Running Ponzi Schemes for Years

8. Michael Booth has long run, and profited from, illegal Ponzi schemes.

9. In 1995, he pled guilty to conspiracy involving a Ponzi scheme he operated. He was sentenced to eighteen months in prison.

10. As detailed more fully in *United States v. Booth*, 309 F.3d 566 (9th Cir. 2002) ("*Booth I*"), upon his release from prison, Booth worked for an entity offering brokering and discounting services to businesses seeking to lease durable equipment.

11. Booth took ownership of that entity. It took in nearly $2,000,000 from financially distressed entities, promising to find them almost immediate funding in exchange for advance payment of fees. The *Booth I* District Court found that, instead, Booth and his co-conspirators produced no funding and "spent the fees as they came in, on salaries for employees and for their own personal expenses, including, among other things, the rental of a jet airplane, automobile leases, jewelry, trips to Las Vegas, and golf lessons." *Booth I*, 309 F.3d at 570.

12. The *Booth I* District Court also found that Booth "was clearly the leader of the fraudulent operation," and that he "prey[ed] on desperate clients and betray[ed] their hopes." *Id.* at 571.

13. This was not Booth's first foray into defrauding the vulnerable; the *Booth I* Court noted that separate and apart from this scheme and his prior Ponzi scheme criminal conviction, "civil judgments for fraud [] had been entered against Booth in the past," and that he "had knowledge of the harm he would cause in taking advantage of desperate individuals because of harm he had caused to other individuals in the past." *Id.* at 577.

14. Booth was convicted of wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956). The Ninth Circuit Court of Appeals affirmed those convictions in *Booth I*, in *United States v. Booth*, 111 F. App'x 498 (9th Cir. 2004) ("*Booth II*"), and in *United States v. Booth*, 200 F. App'x 678, 679 (9th Cir. 2006) ("*Booth III*").

15. The *Booth III* Court noted that the District Court was justified in elevating Booth's sentence given "the sheer number of Booth's crimes and on the fact that Booth had preyed on gullible victims and caused serious financial and emotional harm." *Booth III*, 200 F. App'x at 679. It confirmed "Booth had engaged in similar fraudulent activities in the past." *Id.*

16. Booth was incarcerated in the federal penitentiary for more than a decade as a result of these crimes.

### On His Release, Booth Defrauded and Left Penniless an Elderly Retired Judge

17. Upon his release from prison in 2012, Booth emerged in California's Coachella Valley.

18. At that time, Booth ingratiated himself with the proprietors of another golf car company, Electric Car Distributors, Inc. ("Electric Car"). He convinced Electric Car's owner, retired Los Angeles Superior Court judge Thomas P. Allen, Jr., who was then in his late 80s, to invest his life savings in the company.

19. As he had done in Washington, Booth funneled money and assets out of that company and to himself, putting it out of business and leaving Judge Allen to die in poverty, penniless.

20. Meanwhile, Booth used Judge Allen's life savings to take trips to Las Vegas, to fly on private jets, to buy jewelry, to drive the most exotic sports cars. But, he did not pay his child support obligations.

-5-

**Booth Meanwhile Targeted Other Wealthy Denizens of the Coachella Valley, Continuing His Ponzi Scheme**

21. During this time, Booth controlled another golf car company called Duraworks Metals & Holdings, Inc. ("Duraworks").

22. Booth used Duraworks to secure additional "investments" from unsuspecting victims, including R.D. Hubbard Enterprises Inc. ("R.D. Inc.") to the tune of $1.26 million and Laura Kontomitras for an amount over $1.3 million.

23. Booth used those monies for himself to take vacations, to live luxuriously, and to transfer Duraworks's inventory into yet another golf car entity, Lacern Performance Golf Cars, Inc. ("Lacern"), leaving Duraworks devoid of assets and Kontomitras and R.D. Inc. with bad debts amounting to over $2,000,000.

**Booth and a Co-Conspirator Continued Ponzi Scheme Through Yet Another Entity**

24. On information and belief, Booth and a co-conspirator operating under Booth's control and direction, Randy Glessner, then capitalized Lacern with assets misappropriated from Electric Car, Duraworks, Judge Allen, R.D. Inc., and/or Kontomitras, among others.

25. Booth was calling the shots and running the show at Lacern. He was the ringleader.

26. Via Lacern, Booth targeted members of the Bighorn Golf Club, an exclusive club in Palm Desert, California.

27. Lacern produced luxury golf cars modeled after high-end luxury cars. It had two showrooms in the Coachella Valley.

28. Booth convinced an entity known as Bighorn Ventures, LLC ("Bighorn Ventures"), operated by a Bighorn Golf Club member, to lend Lacern $500,000 pursuant to a written contract, secured by Lacern's substantial inventory of golf cars (each worth in the tens of

thousands of dollars), for the express purpose of purchasing a fleet of golf cars to improve and sell.

29. Booth directed that money to a Wells Fargo Everyday Checking account ending in 0382 (the "DMB Wells Fargo Account") purportedly owned by a business trust organized under the laws of the state of Nevada, DMB-BT.

30. When that loan became due and owing, Booth represented to Bighorn Ventures that his daughter was ill with cancer, that he accordingly lacked funds to repay that loan, that he required additional funds of over several hundred thousand dollars to pay for her treatment. Bighorn Ventures' principal loaned Booth those funds, which Booth again directed to the DMB Wells Fargo Account.

31. None of these monies were used to procure golf cars or to pay for cancer treatment.

32. Instead, Booth used these funds to, among other things, pay for his own membership to another high-end private club, the Balboa Bay Club, where he rented himself a luxury condominium and wined and dined his friends. He also used these funds to procure exotic automobiles for himself, to fly on private airplanes, and to take trips to Las Vegas.

33. Booth and Lacern failed to repay these loans, resulting in litigation.

34. Given its written security interest in Lacern's inventory of golf cars, fixtures, and other merchandise, Bighorn Ventures obtained a temporary restraining order, which was later converted to a preliminary injunction. *See Bighorn Ventures, LLC v. Lacern Performance Golf Cars, Inc.*, Los Angeles County Superior Court Case No. BC 712644. The temporary restraining order and injunction precluded Booth from disposing of Lacern's inventory.

35. After those orders issued, Lacern suddenly and without warning closed for business.

36. In violation of the injunction, Booth emptied the Lacern showrooms.  About this time, two large moving trucks designed to transport golf cars were parked behind one of the buildings.  One of these moving trucks was legally registered to DMB-BT.

37. Booth and his accomplices spirited away all of Lacern's merchandise, in which Bighorn Ventures held a security interest, leaving Lacern devoid of assets, vitiating Bighorn Ventures' security interest.

38. Booth transferred that inventory to a showroom in Costa Mesa, California, where he sold it under the name GC Design Group Corp., yet another Booth shell company pushing golf cars, capitalized with the Lacern's inventory, which itself was acquired with the fruits of Booth's previous golf car scams.

39. Meanwhile, Booth entered into a series of contracts with an entity known as Convoy Capital, a company funded by a member of the Bighorn Golf Club.  Those contracts called for Convoy Capital to pay a set fee to Booth, purportedly for Booth to use to fund the purchase and sale of golf cars.  In return, Booth would repay that set fee, plus interest.

40. In fact, Booth used these funds for his own enjoyment, to purchase exotic automobiles, and, in part, to pay back other investors he bilked.  In the end, he failed to repay Convoy Capital, causing it substantial monetary losses.

## Booth Defrauded McGrath

41. Booth targeted another member of the Bighorn Golf Club, plaintiff Sean P. McGrath.

42. As he had with Bighorn Ventures and Convoy Capital, Booth represented to McGrath that he required short-term loans to purchase a fleet of golf cars to improve and sell for a profit.

43. McGrath reasonably relied on these representations as Booth was in the business of selling high end golf cars to members of the Bighorn Golf Club.

44. These representations were false. Booth never intended to use these monies to purchase a fleet of golf cars for sale, nor did he use funds received from McGrath for this purpose.

45. Specifically, on January 17, 2018, Booth and McGrath entered into a written promissory note (the "January Promissory Note").

46. The January Promissory Note called on McGrath to loan Booth $250,000 with interest to be paid at twenty-five percent (25%), with payment in full in the amount of $312,500 on that loan due on February 14, 2018.

47. Booth directed McGrath to make that loan payment into the DMB Wells Fargo Account, which McGrath did, transferring the loan funds into the possession of DMB-BT.

48. Those funds were not used to purchase a fleet of golf cars for sale; instead, Booth used the money to fund his extravagant lifestyle, paying for his membership to an elite club, his rent for a luxury condo at that elite club, private jet rentals, and to pay back previous investors that he had bilked who came calling for their money.

49. Booth did not repay this loan when it became due.

50. On February 21, 2018, Booth and McGrath entered into a letter agreement which called for the January Promissory Note loan to be repaid in full, with interest, on March 14, 2018.

51. Booth did not repay the loan, in full or in part, when it became due.

52. On March 6, 2018, anticipating that Booth would timely repay the first loan on March 14, 2018, McGrath made a second loan to Booth (the "March Promissory Note"). Specifically, Booth represented to McGrath that he needed additional funds to clear title on certain of his luxury automobiles, which he could then sell and use the proceeds to repay his initial and the subsequent loan, as required under both the January and March Promissory Notes.

53. The March Promissory Note promised a loan by McGrath for $180,000, with a twenty percent (20%) interest rate, to be repaid in full by Booth by April 6, 2018, at $216,000.

54. The parties consented to the terms of the written contract through their conduct and stated assent, with an exchange of the document, followed by an exchange of wiring instructions, followed by McGrath transferring those loan funds pursuant to the wiring instructions provided by Booth.

55. Booth again directed McGrath to make that loan payment into the DMB Wells Fargo Account, which McGrath did, transferring those loan funds into the possession of DMB-BT.

56. Those funds were not used to clear title on certain of Booth's purported luxury automobiles; instead, Booth again used these monies to fund his extravagant lifestyle, paying for private club memberships, for the bills to wine and dine his friends, and for private jet travel. Indeed, Booth testified under oath at his deposition in another matter that he did not ever own any of the cars that he drove, he simply drove them with permission.

57. McGrath made repeated requests to Booth to repay those funds. Instead, in writing, Booth concocted a story involving an attorney named "John" who somehow controlled

Booth's funds and prevented repayment.  Booth's writings were false; the DMB Wells Fargo Account contained sufficient funds to repay McGrath.  Booth simply failed to repay his debts.

## FIRST CLAIM FOR RELIEF
### Breach of Written Contract
### (Against Booth)

58. McGrath incorporates the allegations contained in Paragraphs 1 - 57 as if fully set forth herein.

59. Booth and McGrath entered into two written contracts.  The January Promissory Note called for McGrath to loan Booth $250,000 at a twenty-five percent (25%) interest rate, and the March Promissory Note called for McGrath to loan Booth $180,000 at a twenty percent (20%) interest rate.

60. Both contracts included a clause which held that "All costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by [McGrath] in enforcing [the contract] as a result of any default by [Booth], will be added to the principal then outstanding and will be immediately paid by [Booth]."

61. McGrath performed all obligations imposed on him by the contracts.  He made the loan payments they called for when due.

62. Booth breached the contracts by failing to repay those loan funds, even in part, as called for in the contracts, thereby damaging McGrath.

63. Specifically, McGrath has been damaged in the amount of $250,000 plus twenty-five percent (25%) interest that began to accrue on January 17, 2018 and continues to accrue.  He has been damaged in the additional amount of $180,000 plus twenty percent (20%) interest that began to accrue on March 6, 2018 and continues to accrue.  McGrath has been further damaged

in the amount of legal fees has expended to collect on this debt, which fees continue to accrue and are due and owing to him from Booth under the contract.

## SECOND CLAIM FOR RELIEF
### Fraud
### (Against Booth)

64. McGrath incorporates the allegations contained in Paragraphs 1 - 63 as if fully set forth herein.

65. Booth falsely represented to McGrath that he required and would use loan funds to purchase a fleet of golf cars for improvement and sale and to pay off certain outstanding notes on luxury golf cars he purported to own so that he could sell them and repay the loans.

66. Booth, having consistently run similar Ponzi schemes for the better part of two decades when he was not imprisoned for so acting, knew these representations were false and intentionally made these false representations to induce McGrath to make loans to him.

67. McGrath, familiar with Booth's golf car business via his membership at the Bighorn Golf Club, reasonably relied on these representations to invest in Booth's golf car enterprise through two loans.

68. Booth instead used these funds to maintain his lavish lifestyle.

69. This damaged McGrath in the amount of $430,000.

70. As the Ninth Circuit Court of Appeals previously held, with respect to a separate but similar set of circumstances, Booth "had knowledge of the harm he would cause" as he had done the same to so many other victims in the past. *Booth I*, 309 F.3d at 578.

## THIRD CLAIM FOR RELIEF
### Unfair or Deceptive Act or Practice in Violation of M.G.L. c. 93A, § 11
### (Against Booth)

71. McGrath incorporates the allegations contained in Paragraphs 1 - 70 as if fully set forth herein.

72. At all relevant times, Booth was engaged in the conduct of trade or commerce in his luxury golf car business.

73. At all relevant times, McGrath was engaged in the conduct of trade or commerce in the Commonwealth of Massachusetts, and issuing a loan to a business is an act that is commercial in nature.

74. Booth's fraudulent schemes inducing McGrath's loans to Booth's luxury golf car business constitute unfair or deceptive acts or practices under Chapter 93A, § 2.

75. The unfair or deceptive acts or practices occurred primarily and substantially within Massachusetts, where McGrath has resided throughout his interactions with Booth.

76. Booth's violations of Chapter 93A, § 2 were knowing and willful.

77. As a result of Booth's deceptive acts or practices, McGrath suffered monetary damages of $430,000 and is entitled to all damages authorized by Chapter 93A, § 11.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against DMB-BT)**

78. McGrath incorporates the allegations contained in Paragraphs 1 - 77 as if fully set forth herein.

79. DMB-BT, a business trust organized under the laws of the State of Nevada, received $430,000 from McGrath as directed by Booth resulting from these loan transactions.

80. Allowing DMB-BT to retain those funds would be unjust, as it offered nothing of value to McGrath in return for them.

81. Instead, as part of an ongoing Ponzi scheme, Booth directed these loan proceeds to this shell entity that he used to keep himself judgment-proof from his various victims.

82.   The interests of justice call for a judgment requiring DMB-BT to return those funds to McGrath.

## PRAYER FOR RIEF

WHEREFORE, McGrath prays for the following relief.

**As Against Booth**

1.   $250,000 plus interest that began to accrue on January 17, 2018 and continues to accrue;

2.   $180,000 plus interest that began to accrue on March 6, 2018 and continues to accrue;

3.   For double or treble damages for his willful and knowing violations of Chapter 93A;

4.   For his attorney's fees in bringing this action, including the costs of the suit incurred herein; and

5.   For such other and further relief as the Court deems just and proper.

**As Against DMB-BT**

1. $430,000 plus prejudgment interest thereon; and

2. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Sean P. McGrath demands a trial by jury on all issues so triable.

| | |
|---|---|
| DATED:  September 4, 2020 | **Sean P. McGrath,** |
| | By his attorneys, |

/s/_____
Martin C. Pentz (BBO #394050)
Emily J. Nash (BBO #696460)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

Ryan M. Lapine (*pro hac vice pending*)
DIAMOND McCARTHY LLP
333 South Hope Street, Suite 4050
Los Angeles, CA 90071
Telephone: (424) 278-2335
Facsimile: (424) 278-2339
Ryan.Lapine@DiamondMcCarthy.com

*Attorneys for Sean P. McGrath*